## HOWARD et al. v. MAXWELL MOTOR CO., Inc., et al.

(District Court, S. D. New York. June 1, 1920.)

1. **Corporations ⎦579(1)—Contingent claim held not barred by reorganization.**

Where, on the reorganization of a corporation which owned the stock of subsidiary companies, and the sale of the property of all the companies through a creditors' suit, there being no secured creditors, provision was made for all stockholders and all creditors of all the companies who proved their claims, but no provision was made for the contingent claim of a lessor, on whose lease a subsidiary was guarantor, but, on the contrary, the decree permitted the reorganized company as purchaser to ·disaffirm any contract made by its predecessors, and it disaffirmed the contract of guaranty after paying an installment of rent to prevent a default, which would enable the lessor to prove a claim thereunder, the lessor *held* not barred, but on a subsequent default entitled to subject to his claim assets of the guarantor in the hands of the reorganized company.

2. **Corporations ⎦579(1)—Contingent claim not barred by reorganization through judicial sale, where matured by reorganized corporation's default.**

While a contingent claim, which is so uncertain as not to be capable of proof, may be barred by a stockholders' reorganization through a judicial sale of the property, it is not so barred where the reorganized corporation by its own act brings about the default which matures the contingent claim into an absolute liability.

In Equity. Suit by Harold A. Howard and John C. Howard, trustees under the will of Sarah J. Howard, deceased, against the Maxwell Motor Company, Incorporated, and the Maxwell-Briscoe Motor Company. Decree for complainants.

The report of Van Vechten Veeder, Special Master, is as follows:

This is a suit in equity by Harold A. Howard and John C. Howard, trustees under the last will and testament of Sarah J. Howard, deceased, citizens and residents of the state of Illinois, against the Maxwell Motor Company, Incorporated, a Delaware corporation, and the Maxwell-Briscoe Motor Company, a New York corporation, in which the plaintiffs seek to enforce against assets of the Maxwell Motor Company, Incorporated, a judgment secured by them in the Supreme Court of New York against the Maxwell-Briscoe Motor Company as guarantor on a lease. On December 10, 1909, the plaintiffs leased to the Maxwell-Briscoe Chicago Company, an Illinois corporation (its name was subsequently changed to the United Motor Chicago Company), a parcel of real estate in Chicago, Ill., for a term of 20 years at a specified rental. The fulfillment of the conditions and requirements of this lease by the lessee was guaranteed by the Maxwell-Briscoe Motor Company, which controlled the Maxwell-Briscoe Chicago Company through ownership of its capital stock. The business of the Maxwell-Briscoe Chicago Company was the sale of the product of the Maxwell-Briscoe Motor Company, and this business was carried on by a resident manager with the advice and assistance of the president and general manager of the Maxwell-Briscoe Motor Company.

At the time it entered into said guaranty the Maxwell-Briscoe Motor Company was a corporation of good financial standing, carrying on a thriving business in the manufacture and sale of automobiles, having large and valuable plants at Tarrytown, N. Y., Newcastle, Ind., and Providence, R. I. Early in the year 1910 it joined the Dayton Motor Car Company, the Brush Runabout Company, the Alden-Sampson Manufacturing Company, and the Columbia Motor Car Company in the formation of the United States Motor Company. The United States Motor Company was formed through the acquisition of practically all the capital stock of the various companies above named

in exchange for capital stock of the new company. Thereafter the heads of departments of the United States Motor Company directed the operations of the subsidiary companies through supervisors appointed by it. The United States Motor Company purchased and delivered material to the subsidiary companies and paid their pay rolls, and took back from them finished automobiles, crediting the subsidiaries with the agreed price as against the money and material furnished to them. The subsidiary sales companies, such as the United States Motor Chicago Company, sold automobiles on sight drafts with the bill of lading attached, and when they needed financial assistance either the United States Motor Company or one of the subsidiaries indorsed their paper to enable them to secure loans from banks. The United States Motor Company made liberal use, upon its own paper and the paper of subsidiary companies, of the indorsement of the Maxwell-Briscoe Motor Company, which was the largest of the subsidiaries of the United States Motor Company.

In October, 1911, the United States Motor Company issued $6,000,000 of debenture bonds. These bonds were in reality notes of the company. In November, 1911, the United States Motor Company became financially embarrassed. The difficulty arose from the necessity of meeting the interest on its debenture bonds. By the spring of 1912 the financial situation of the company was such that the holders of the debenture bonds organized a committee to protect their interests. One of the principal movers in this matter was the Central Trust Company of New York, which held some of the debentures, and its counsel acted as counsel to the committee.

In the autumn of 1912 a reorganization was decided upon. Accordingly, on September 12, 1912, the Brown & Sharp Manufacturing Company of Rhode Island, to which the United States Motor Company was indebted for materials sold, filed a bill in equity in the United States District Court for the Southern District of New York, alleging the inability of the company to meet its current obligations and asking for the appointment of a receiver. The Maxwell-Briscoe Motor Company and practically all the subsidiaries of the United States Motor Company were joined with it as parties defendant. Answers of all the defendants were filed with the bill of complaint, admitting the allegations of the bill and consenting to the appointment of a receiver. Receivers were appointed on the same day.

On October 10, 1912, the bondholders' committee, then called the reorganization committee, composed principally of well-known New York bankers, issued a plan of reorganization. "The plan contemplates," the committee states, "the organization of a new company or companies to acquire, as mentioned in the plan, substantially all of the property of the motor company and the subsidiary companies free from debt, except certain real estate mortgages aggregating approximately $164,540, and to cause such new company or companies to be supplied with a cash working capital of about $3,000,000 in addition to its accounts receivable, inventories, and other liquid assets. In the opinion of the committee a speedy reorganization is necessary if the value of the property, assets, business, and good will of the motor company and of the subsidiary companies is to be preserved. A good part of the value of said companies is the existing organization of their employees, plants and business and their value as a going concern. The value of the mere physical assets if sold upon a liquidation of the properties would be far less than their intrinsic value, and ruinously less than their value as a concern."

The plan contemplated the creation of a new company and the issue of $11,000,000 first preferred stock, $9,000,000 second preferred stock, and $11,000,000 common stock. Creditors and stockholders depositing under the plan of reorganization were to receive on completion of reorganization cash or voting trust certificates as follows:

1. For each $1,000 principal amount of notes of one or more of the subsidiary companies indorsed by the Motor Company, and notes of one or more of the branch selling companies, indorsed by the Motor Company, or merchandise claims against the Motor Company for goods sold subsequent to

June 15, 1912, or for other claims established against one or
more of the subsidiary companies, in cash.................$1,000.00
And in addition the amount of interest due thereon to Sep-
tember 12, 1912.
2. For each $1,000 of indebtedness represented by debenture
bonds or bond scrip (whether principal or interest to Sep-
tember 12, 1912), voting trust certificates representing:
    (a) New first preferred stock (50 per cent.)............$   500.00
    (b) New second preferred stock (50 per cent.)...........   500.00
    (c) New common stock (40 per cent.)....................   400.00
3. For each $1,000 of claims against or established against the
Motor Company only (whether principal or interest to Sep-
tember 12, 1912):
    (a) Cash (25 per cent.)...............................$   250.00
        And voting trust certificates representing:
    (b) New first preferred stock (25 per cent.)............   250.00
    (c) New second preferred stock (25 per cent.)...........   250.00
    (d) New common stock (15 per cent.)....................   150.00
4. For each share $100 par value of preferred stock of the Motor
Company or of the Columbia Company upon payment of $24
per share, voting trust certificates representing:
    (a) New first preferred stock (24 per cent.).............$    24.00
    (b) New second preferred stock (25 per cent.)...........    25.00
    (c) New common stock (30 per cent.)....................    30.00
5. For each share of $100 par value of common stock of the Mo-
tor Company or of the Columbia Company, upon payment
of $24 per share, voting trust certificates representing:
    (a) New first preferred stock (24 per cent.).............$    24.00
    (b) New second preferred stock (17½ per cent.)........    17.50
    (c) New common stock (30 per cent.)....................    30.00

Under this plan of reorganization, then, creditors of the subsidiary com-
panies, such as the Maxwell-Briscoe Motor Company, were to receive pay-
ment in full; claimants against the United States Motor Company were to
receive 25 per cent. cash and the remainder in stock; the debenture bond-
holders were to receive stock for their bonds; holders of the preferred and
common stock of the United States Motor Company and the Columbia Com-
pany, upon payment of an assessment of $24 per share, new preferred and
common stock. So far as the stockholders are concerned, this plan was car-
ried out. With respect to creditors the terms of participation were de-
scribed in the plan as follows: "Holders of notes made or indorsed by the
Motor Company, or made or indorsed by one or more of the subsidiary com-
panies, may become parties to the plan and agreement of reorganization by
depositing their notes indorsed in blank without recourse with the depositary
at its said office. Holders of other obligations of or claims against the Motor
Company or the subsidiary companies may become parties to the plan and
agreement of reorganization by depositing with the depositary at its said office
their obligations and claims if evidenced by an instrument in writing, or if
not evidenced by an instrument in writing by depositing a statement of such
claims, and in either case accompanied by an appropriate assignment or
transfer thereof without recourse in such form as may be determined by the
committee." By the order appointing receivers all creditors were directed to
file with the receivers within 60 days "a duly sworn statement of all and any
such claims as they may have or assert against the defendant companies or
any of them." The time for filing claims, as finally extended by the court,
expired December 15, 1917.

The receivers secured an appraisal by Gunn, Richards & Co. of the real
estate, buildings, and equipment of all the plants, first as a going concern
and then at auction values (Plaintiff's Exhibit 26). They also had their
auditors, West & Flint, prepare a statement of the assets and liabilities of
all the companies on September 11, 1912, first as a going concern (Plain-
tiff's Exhibit 8) and then at auction values (Defendant's Exhibit H). Exhibit
8 shows an excess of assets over liabilities for all the companies of $910,309.33,

while Exhibit H shows an excess of liabilities over assets of $5,492,658. With respect to the Maxwell-Briscoe Motor Company alone, Exhibit 8 shows an excess of assets over liabilities of $3,247,450.77, while Exhibit H shows an excess of liabilities over assets of $720,047.76. The fundamental difference between the two appraisals arises, of course, from the estimated value as part of a going concern and at their auction value; but it is quite as important to consider the nature of the liabilities. Claims were filed against the United States Motor Company to the amount of $12,750,965.54; against the Maxwell-Briscoe Motor Company alone to the amount of $2,637,788.94. This aggregate is, however, very much in excess of the actual liability. Many of the claims filed against both the United States Motor Company and one of the subsidiary companies arise out of two-name paper. In the next place, the United States Motor Company was itself a creditor of the subsidiary companies to the amount of upwards of $4,500,000; and, finally, many of the unliquidated damage claims were against more than one company. With respect to the Maxwell-Briscoe Motor Company alone, Exhibit 8 shows an excess of assets over liabilities of $3,247,450.77, while Exhibit H shows an excess of liabilities over assets of $720,047.76. The difference between the two appraisals is mainly due to the fact that the total assets of this company, other than any company accounts, are appraised at $4,270,901.32 as a going concern, and at $2,023,702.07 at auction values. On the liability side is included, however, its contingent liability to the extent of $994,713.17 as indorser on notes of one or more of the other companies.

The receivers were granted leave to issue receivers' certificates sufficient in amount to enable them to embark on a plan for making cars for the 1913 market, but this plan was not carried out, and the receivers confined themselves substantially to repair work and completion of cars from materials in hand. In this way it was possible to keep the organization intact, and with this important end in view, a recognized expert, Mr. Walter E. Flanders, was employed as manager.

On the application of the receivers for directions, various hearings were had before the court, and it was finally decided to sell the property. The decree of sale, dated November 18, 1912, provided for the conveyance and transfer of the property purchased to the purchaser, his successors, assigns or nominees who "shall be let into the possession of any or all of said property, and shall thereafter hold, possess, and enjoy the said property free from any and all estate, right, title, claim, demand, interest, or equity of redemption of in or to the same of the defendants herein, their respective creditors and stockholders, and any and all persons, firms, or corporations claiming by, through, or under them or any of them, subject only to the right of the court, as herein especially reserved, to retake possession of and resell such property in case the said grantee or grantees shall fail to comply, after due order, with any of the terms and conditions of sale."

The decree of sale further provided as follows: "The purchaser or purchasers, his or their successors, assigns or nominees, shall be allowed the period of 60 days from the date of delivery of possession to him or them by the receivers within which to elect whether or not to adopt or assume any lease, agreement, or other contract which may be included in the property sold or which may constitute an incident or appurtenance thereof, and such purchaser or purchasers, his or their successors, assigns, or nominees, shall not be held to have accepted or assumed any such lease, agreement, or other contract which he, it, or they shall not so elect to accept or assume. Such election shall be made by an instrument in writing subscribed by the purchaser or purchasers, his or their successors, assigns, or nominees, and filed in the office of the clerk of this court, and no conduct or use of rights by any purchaser or purchasers, his or their successors, assigns, or nominees, within said period of 60 days, unaccompanied by the filing of such written instrument, shall be deemed to conclude such purchaser or purchasers, his or their successors, assigns, or nominees, in respect of such election."

On December 12, 1912, the committee's plan of reorganization was declared effective. Pursuant to this plan a new company, called the Standard Motor Company, was organized January 2, 1913. Its name was soon afterward changed to the Maxwell Motor Company, Incorporated. At a meeting

of the reorganization committee held January 6th for consideration of the bid to be made for the property, the minutes show this entry: "Mr. Rathbone made a statement to the meeting with reference to the auction values of the properties of the United States Motor Company and subsidiary companies, and suggested that bids based upon such values be made therefor in the alternative; i. e., bids for the properties themselves, or bids by way of an offer to pay the outstanding claims which have been filed, a certain per cent. of their amount." A resolution was then passed:

"Resolved that bids for the properties of the United States Motor Company, Alden-Sampson Manufacturing Company, Brush Runabout Company, Columbia Motor Car Company, Dayton Motor Car Company, and Maxwell-Briscoe Motor Company be made in the alternative as follows:

| | Amount of Bid for Property | Per Cent. to be Paid on Amount of Claims. |
|---|---|---|
| United States Motor Company | $3,700,000 | 32½ |
| Alden-Sampson Manufacturing Company | 265,000 | 24 |
| Brush Runabout Company | 350,000 | 33 |
| Columbia Motor Car Company | 390,000 | 91 |
| Maxwell Briscoe Motor Company | 1,400,000 | 60" |

A written bid was accordingly submitted in the names of Henry C. Holt and William McAllister, Jr., two employees of the central Trust Company. This bid (the only bid made) was considered by Judge Hough, and on January 11th he filed a memorandum approving the percentage bid in terms which show on their face that he considered values at forced sale only. Thereafter Holt and McAllister transferred and assigned all their rights in the sale to Charles W. Hill and Leicester C. Collins. A contract was drawn between Hill and Collins, on one side, and the Standard Motor Company (afterwards the Maxwell Motor Company, Incorporated), on the other, which draft was submitted to the directors of the new company at the meeting on January 11th and duly approved. By this contract the company issued for the property bid in at the sale: "Fully paid, nonassessable stock of the Delaware Company (Maxwell Motor Company), namely: (a) 110,000 shares of first preferred stock of the par value of $100 each; (b) 90,000 shares of the second preferred stock of the par value of $100 each; (c) 109,950 shares of the common stock of the par value of $100 each—or $30,995,000 worth of stock."

This contract, which is set out in the minutes of the directors' meeting of the new company on January 11th (Plaintiffs' Exhibit 16), recites: "It is understood that the properties offered for sale under the decree of sale Exhibit A above referred to, and to be acquired by the vendors in pursuance of the bid and of the assignment thereof, and of the contract, Exhibit B, above referred to, between the purchasers and the committee, will be acquired by the vendors at the scrap or auction value thereof, as the same was appraised by appraisers appointed or approved by the United States District Court for the Southern District of New York, no allowance being made for the value of the plants included in said property, as plants which might be used for the purposes for which they were built, nor for any value arising from the value of the property as constituting a complete organization, with its personnel, organization, established business, and good will as a going concern, and that the vendors were enabled to obtain said property by reason of the agreement, Exhibit B, between the purchasers and the committee above referred to, which said agreement was assigned to the vendors, as hereinbefore set forth, said committee acting on behalf of and as agent of creditors who had submitted their claims to the plan and agreement of reorganization, dated October 10, 1912, Exhibit C (hereinafter called the reorganization plan), aggregating upwards of 96 per cent. in amount of the creditors of the several defendant companies in the suit instituted in the United States District Court for the Southern District of New York above referred to; and it is understood that the purchase of said property was made under arrangement whereby creditors who have not assented to the reorganization plan will receive a dividend representing only what they could expect from the sale and liquidation of said property as a closed-down and disrupted property, sold at forced sale; and

it is understood that the price at which the vendors are to acquire the property and business aforesaid does not represent the real value of the property as a going concern with its good will and organization, and that the price named by the vendors in this contract is greatly in excess of the price at which they are to acquire the property offered for sale under the decree of sale, Exhibit A above referred to."

The contract also set forth that "the board of directors of the Delaware Company (Maxwell Motor Company) have by resolution duly adopted by said board determined that the value of the property hereinafter mentioned is at least as great as the par value of the stock to be delivered hereunder therefor." A decree confirming the sale was entered January 11, 1913, and the property was delivered forthwith to the Maxwell Motor Company.

The charter of the United States Motor Company was forfeited January 18, 1916, for nonpayment of the state tax of the state of New Jersey. Meanwhile rent due under plaintiffs' lease had been paid in advance on September 10 and December 10, 1912, and March 10, 1913. On March 11th the Maxwell Motor Company, pursuant to power given in the final decree of sale, filed in court notice of intention not to assume the Maxwell-Briscoe Motor Company's guaranty of the plaintiffs' lease. The lessee defaulted in payment of the rental falling due June 10th. Thereupon the plaintiffs, on June 15th, attempted to distrain for rent on the property of the United Motor Chicago Company. On June 24, 1913, a voluntary petition in bankruptcy was filed by the United Motor Chicago Company, which was adjudicated a bankrupt June 27, 1913, and, after paying a small percentage on claims, was duly discharged.

On August 11, 1913, the plaintiffs brought suit in the Supreme Court of this state against the Maxwell-Briscoe Motor Company upon its guaranty. After issue had been joined in 1914, notice was served on the plaintiffs that they were barred from proceeding by an injunction issued by the United States District Court for the Southern District of New York in the equity action. The plaintiffs thereupon filed a petition in the latter court for leave to proceed or for instructions. Judge Learned Hand decided that, inasmuch as the property had been sold and turned over, intervention in the equity suit would be unavailing, and permission was granted to continue the suit. Thereupon the plaintiffs amended their complaint, so as to show the amount of rentals which had fallen due at that time, the premises being still unrented. Thereafter it was agreed by counsel that, inasmuch as the building had been rented meanwhile under a clause giving the landlord the right to re-enter and rent, but for a rental below the stipulated rate in the original lease, a stipulation should be entered into between the parties whereby, if the motion for judgment which had been made by the defendant should be held against the defendant, a judgment might be entered upon the stipulation for an amount to be fixed by stipulation. A stipulation was accordingly entered into between the parties, whereby, after crediting upon the lease all moneys obtained either in the bankruptcy proceeding or from subtenants before their leases expired, and taking into account all the damages which had accrued up to the time of the stipulation through the failure to pay rent and other payments required by the lease as rental, and also taking into consideration the difference between the rate at which the building was rented for the balance of the term and the rate of rent under the lease with the Maxwell-Briscoe Chicago Company, the amount due was fixed at $132,000 with interest at 6 per cent. from the date of the stipulation.

The trial court found against the defendant on its motion for judgment, holding that "on the last day fixed by the federal court for the filing of claims against the receivers of the defendant, the plaintiffs' claim had not matured, and was therefore not provable, because the principal debtor had not yet defaulted." This conclusion was affirmed by the Appellate Division and by the Court of Appeals, without opinion. Finally, on November 1, 1917, judgment was entered against the Maxwell-Briscoe Motor Company in the Supreme Court of New York County in accordance with the stipulation for $142,560. Execution was thereafter issued and returned no property found December 27, 1917, and this suit was begun July 12, 1918.

The principles applicable to corporate reorganizations were formulated by the Supreme Court in the case of Northern Pacific Railway Co. v. Boyd, 228

U. S. 482, 33 Sup. Ct. 554, 57 L. Ed. 931, and reaffirmed in Kansas City Southern Railway Co. v. Guardian Trust Co., 240 U. S. 166, 36 Sup. Ct. 334, 60 L. Ed. 579. Reorganization of a financially embarrassed corporation, pursuant to a contract whereby the corporate property is transferred by stockholders from themselves to themselves in a new company, cannot defeat the claim of a nonassenting creditor. As against such creditor the sale is void in equity, regardless of the motive with which it was made. If purposely or unintentionally a single creditor was not paid or provided for in the reorganization, he can assert his superior rights against the subordinate interests of the old stockholders in the property transferred to the new company. Any device, whether by private contract or judicial sale under consent decree, whereby stockholders are preferred before the creditor, is invalid, and the transaction is void, even in the absence of fraud in the decree. The property is a trust fund charged primarily with the payment of corporate liabilities, and in the hands of the former owners under a new charter is as much subject to any existing liability as that of a defendant who buys his own property at a tax sale. Unsecured creditors need not necessarily be paid in cash. Their interest can be preserved by the issuance, on equitable terms, of income bonds or preferred stock. If creditors decline a fair offer, they are left to protect themselves as other creditors of a judgment debtor, and, having refused to come into a just reorganization, they will not thereafter be heard in a court of equity to attack it. If, however, no such tender was made and kept good, such a creditor retains the right to subject the interest of the old stockholders in the property to the payment of his debt. If their interest is valueless, he gets nothing. If it be valuable, he merely subjects that which the law had originally and continuously made liable for the payment of corporate liabilities.

In the application of these principles to the case in issue, the various allegations of actual fraud with which the complaint is replete may be put aside. None has been proved. Actual fraud, however, is not essential to a recovery. Where such a transaction is consummated without offering to an unsecured creditor a fair share of the benefits to be derived from the vesting of the title in the purchaser, the intent or purpose to deprive him of recourse to the property to collect his debt becomes immaterial; the fact that it has that effect charges the purchaser with liability. Central Improvement Co. v. Cambria Steel Co., 210 Fed. 696, 701, 127 C. C. A. 184. The specific defenses asserted in this, as in the state court action by the same plaintiffs, are that the reorganization plan provided for fair participation to the plaintiffs, of which they failed to avail themselves, that the guaranty of the plaintiffs' lease was disclaimed pursuant to the terms of the decree of sale, and that having complied with the terms of the decree the purchaser is free from liability.

It is clear that the reorganization plan did not provide for fair participation by the plaintiffs. It made no provision whatever for them, and they were in fact effectually prevented from any participation. At no time within the period available for filing claims did the plaintiffs have a provable claim on the guaranty. The rental under the lease was duly paid until the sale and transfer of the corporate property. Then the purchaser disclaimed the guaranty and the lessee went into bankruptcy. There cannot be an absolute guaranty of payment, unless there be a principal liability. If there be no debt or default of a third person, there can be no guaranty. Pennsylvania Steel Co. v. New York City Railway Co., 198 Fed. 721, 738, 751, 117 C. C. A. 503. Here there could be no default until the debt matured; the undertaking in question was a contingent, not an absolute, promise. It became effective in creating an absolute liability only upon default by the lessee. The guarantor was therefore under no obligation to pay, and there was no debt to be paid, until the contingent liability had matured into an absolute liability. People v. Metropolitan Surety Co., 205 N. Y. 135, 98 N. E. 412, Ann. Cas. 1913D, 1180.

The plaintiffs are, then, in a position to assert their superior rights. Inasmuch as they were not parties to the record in the equity sale, that decree is not binding on them. Northern Pacific Ry. Co. v. Boyd, 228 U. S. 482, 505, 33 Sup. Ct. 554, 57 L. Ed. 931. What they are required to prove is indicated by the following passage from the opinion of the Supreme Court in the Boyd

Case, 228 U. S. 507, 508, 33 Sup. Ct. 554, 561 (57 L. Ed. 931) : "The invalidity of the sale flowed from the character of the reorganization agreement regardless of the value of the property, for in cases like this the question must be decided according to a fixed principle, not leaving the rights of the creditors to depend upon the balancing of evidence as to whether, on the day of sale the property was insufficient to pay prior incumbrances. The facts in the present case illustrate the necessity of adhering to the rule. The railroad cost $241,000,000. The lien debts were $157,000,000. The road sold for $61,000,000, and the purchaser at once issued $190,000,000 of bonds and $155,000,000 of stock on property which, a month before, had been bought for $61,000,000. It is insisted, however, that not only the bid at public outcry, but the specific finding in the Paton Case, established that the property was worth less than the incumbrances of $157,000,000, and hence that Boyd is no worse off than if the sale had been made without the reorganization agreement. In the last analysis, this means that he cannot complain if worthless stock in the new company was given for worthless stock in the old. Such contention, if true in fact, would come perilously near proving that the new shares had been issued without the payment of any part of the implied stock subscriptions, except the $10 and $15 assessments. But there was an entirely different estimate of the value of the road when the reorganization contract was made. For that agreement contained the distinct recital that the property to be purchased was agreed to be 'of the full value of $345,000,000, payable in fully paid nonassessable stock and the prior lien and general lien bonds to be executed and delivered as hereinafter provided.' The fact that at the sale, where there was no competition, the property was bid in at $61,000,000 does not disprove the truth of that recital, and the shareholders cannot now be heard to claim that this material statement was untrue and that as a fact there was no equity out of which unsecured creditors could have been paid, although there was a value which authorized the issuance of $144,000,000 fully paid stock. If the value of the road justified the issuance of stock in exchange for old shares, the creditors were entitled to the benefit of that value, whether it was present or prospective, for dividends, or only for purposes of control. In either event it was a right of property out of which the creditors were entitled to be paid before the stockholders could retain it for any purpose whatever."

If, as the Supreme Court distinctly held, the reorganized corporation is bound by its own recital of the value of the property, the plaintiffs' case is clear. For the situation here is substantially similar to the situation outlined by the Supreme Court in the Boyd Case. The corporate property was sold under the decree for specified per cent. payments of claims (plus administration expenses), which may be regarded as substantially equivalent to the alternative bid of $6,105,000 for the property. The purchaser at once issued $30,995,000 of stock for property which had been bought for something over $6,000,000. This statement is substantiated by the formal recital, to which reference is hereafter made, that the value of the property purchased was equivalent to the stock issued for it. The actual transaction was somewhat different, for stock was issued for the debentures and in part for claims established against the Motor Company. But, excluding from the computation all the stock issued to debenture holders, and assuming that stock was issued for 75 per cent. of all the claims filed against the United States Motor Company, as if it were absolutely liable, the remaining stock issued for the property purchased would at face value still be twice the price paid for it. Of course the Motor Company was not even primarily liable on all the claims filed against it, and the purchasers paid in fact only 32½ per cent. of the face of the claims.

Here, as in the Boyd Case, it is contended that the liabilities exceeded the assets. If this contention were true in fact, it would in this case, as the court said in that case, come near proving that the new shares had been issued without payment of anything beyond the $24 assessment per share. But there was an entirely different estimate of the value of the property when the reorganization took place. The contract between the Motor Company and Hill and Collins contained a recital that the property was acquired at its "scrap or auction value"—"no allowance being made for the value of

the plants included in said property as plants which might be used for the purposes for which they were built, nor for any value arising from the value of the property as constituting a complete organization, established business and good will as a going concern"—all of which the Motor Company secured under the contract. There was a further recital that the price at which the property and business was acquired "does not represent the real value of the property as a going concern with its good will and organization, and that the price named by the vendors in this contract is greatly in excess of the price at which they are to acquire the property." Finally, the contract set forth that the board of directors of the Motor Company had formally "determined that the value of the property hereinafter mentioned is at least as great as the par value of the stock to be delivered hereunder therefor." The fact that at the sale, where there was no competition, the property was bid in at a little over $6,000,000 does not in this case, any more than it did in the Boyd Case, disprove the truth of that recital, and the conclusion follows that the Motor Company cannot now be heard to claim that this material statement was untrue, and that in fact there was no equity out of which unsecured creditors could have been paid.

Apart from the effect of the Motor Company's formal admission, I am satisfied that an equity in the property of the Maxwell-Briscoe Motor Company sufficient in amount to satisfy the plaintiffs' claim did pass to the Maxwell Motor Company under this reorganization and sale. The record does not admit of definite figures, because the reorganization was effected by the purchaser out of court. The receivers filed no accounting in court. The defendants' books were not available, and very little testimony was offered in explanation of the actual working out of the reorganization. The oral testimony concerning valuations affords little assistance. The various appraisals afford the sale basis for definite figures.

The Maxwell-Briscoe Motor Company was the backbone of the United States Motor Company's organization. As a going concern, as the purchaser really acquired it, it was amply solvent. Even at the appraised scrap value it was not found to be insolvent. As Judge Hough said when the question of sale was under consideration (Exhibit G, p. 116) : "On the facts and papers submitted the Maxwell-Briscoe Company is not insolvent in the strict sense of the word, but it is insolvent in the ordinary and usual sense of the word; that is to say, it is unable to discharge its liabilities as they accrue," etc.

The appraisal at auction values (Exhibit H) shows assets almost entirely of a tangible nature. The inter-company accounts receivable aggregate only a little over $50,000. On the other hand, $2,422,712.04 of the listed liabilities of $2.795,342.54 are claims against this company jointly with other companies involved. The bulk of this amount appears to represent claims by holders of notes either made or indorsed by one of the other defendant companies. In part, therefore, it represents a contingent, not an absolute, liability on the part of the Maxwell-Briscoe Company. It is admitted that part of this contingent liability was never enforced against that company; there is no proof that any of it was actually so enforced. The facts with respect to the entire reorganization must be available to the defendants, and in the absence of proof theoretical computations favorable to their defense are not persuasive.

Accordingly I respectfully recommend that the plaintiffs have a decree for the sum of $142,500, with interest from November 1, 1917, which shall constitute a lien on assets of the Maxwell-Briscoe Motor Company which passed to the Maxwell Motor Company under the reorganization and sale, and that suitable provision be made for its enforcement against the Maxwell Motor Company.

Norman K. Anderson, of Chicago, Ill., and F. Leon Shelp, of New York City, for plaintiffs.

Larkin & Perry, of New York City (Henry V. Poor and Donald C. Muhleman, both of New York City, of counsel), for defendants.

MAYER, District Judge. This exceedingly interesting case is, in some respects, one of first impression. The facts are carefully set forth in the clear and comprehensive opinion of the special master. It will not be necessary, therefore, to repeat them in detail, but merely to outline so much thereof as is requisite to explain the controversy.

[1] The suit is brought to enforce against assets of Maxwell Motor Company, Incorporated, a judgment obtained by plaintiffs in the New York Supreme Court against Maxwell-Briscoe Company as guarantor on a lease. On December 10, 1909, plaintiffs let to Maxwell-Briscoe Chicago Company, an Illinois corporation (whose name was subsequently changed to United States Motor Chicago Company), certain real estate in Chicago for a term of 20 years for a specified rental. The fulfillment of the conditions and requirements of this lease by the lessee was guaranteed by Maxwell-Briscoe Chicago Company through ownership of its capital stock. At the time it entered into the guaranty, Maxwell-Briscoe Motor Company was in good financial standing, and was doing a successful business in the manufacture and sale of automobiles. In 1910 it joined certain other companies in the organization of United States Motor Company. The last-named company was formed through the acquisition of practically all the capital stock of the various companies in exchange for capital stock of the new company. A system of business was then set up whereby the United States Motor Company directed the operations of the various subsidiary companies.

In November, 1911, United States Motor Company became financially embarrassed by reason of the difficulty of meeting the interest on debenture bonds which it had issued in 1911 to the extent of $6,000,-000. A protective committee was formed, and in the fall of 1912 a reorganization was decided upon, and on September 12, 1912, Brown & Sharpe Manufacturing Company, of Rhode Island, filed a bill in equity in this court, alleging inability of the company to meet its current obligations and asking for the appointment of a receiver. Practically all of the subsidiary companies (including Maxwell-Briscoe Motor Company) were joined as parties defendant and filed answers, admitting the allegations of the bill and consenting to the appointment of a receiver. Receivers were thereupon appointed on September 12, 1912.

On October 10, 1912, the reorganization committee issued a plan of reorganization. The plan contemplated the creation of a new company and the issue of first and second preferred stock and common stock. The plan provided only for unsecured creditors and stockholders, as there were not any secured creditors. Such creditors and stockholders as deposited under the plan were to be taken care of as follows: (1) Creditors of the subsidiary companies such as Maxwell-Briscoe Motor Company were to receive payment in full; (2) claimants against United States Motor Company were to receive 25 per cent. in cash and the remainder in stock; (3) the debenture bondholders were to receive stock for their bonds; and (4) holders of the preferred and common stock of United States Motor Company and Columbia Company (one of the subsidiaries), upon payment of $24 per share, were to receive new and preferred stock.

No provision whatever was made in the plan for contingent claims; i. e., for a claim such as that of plaintiff, which would arise only if the rent were not paid. The reorganization plan, so far as it went, seems to have been entirely fair, and to have contemplated a just disposition of the claims of the respective classes of creditors covered by it, and so Judge Hough thought, as is evidenced by his opinion filed January 9, 1913.

By order of court, the usual provision for filing claims was made, and the time therefore expired December 15, 1912. Appraisals of the property (1) as a going concern and (2) at auction values were made by well-known and expert appraisers. Experienced auditors also prepared a statement of the assets and liabilities of all the companies (1) as a going concern, and (2) at auction values.

With these data before the court, and the usual problem as to whether business should be continued by the receivers or the property should be sold, the court, after several hearings, decided that the property should be sold, and accordingly made and filed its decree of sale dated November 18, 1912. This decree provided, inter alia:

"The purchaser or purchasers, his or their successors, assigns, or nominees, shall be allowed the period of 60 days from the date of delivery of possession to him or them by the receivers within which to elect whether or not to adopt or assume any lease, agreement, or other contract which may be included in the property sold, or which may constitute an incident or appurtenance thereof, and such purchaser or purchasers, his or their successors, assigns, or nominees, shall not be held to have accepted or assumed any such lease, agreement, or other contract which he, it, or they shall not so elect to accept or assume. Such election shall be made by an instrument in writing, subscribed by the purchaser or purchasers, his or their successors, assigns, or nominees, and filed in the office of the clerk of this court, and no conduct or use of rights by any purchaser or purchasers, his or their successors, assigns, or nominees, within said period of 60 days, unaccompanied by the filing of such written instrument, shall be deemed to conclude such purchaser or purchasers, his or their successors, assigns, or nominees, in respect of such election."

On December 12, 1912, the reorganization plan was declared effective. Agreeably therewith, a new company, called Standard Motor Company (whose name was afterward changed to Maxwell Motor Company, Incoporated), was organized January 2, 1913. At a meeting of the reorganization committee held January 6, 1913, a resolution was passed to the effect that bids for the properties of the United States Motor Company and the subsidiaries, including Maxwell-Briscoe Motor Company, should be made in the alternative; i. e., either cash for the property, or a per cent. to be paid on the amount of claims. The alternative bids authorized in respect of Maxwell-Briscoe Company were $1,400,000, or 60 per cent. on the amount of claims.

The cash bid, known as bid No. 1, was regarded by Judge Hough as less desirable (for reasons set forth in his opinion of January 9, 1913) than the per cent. of claims bid, known as bid No. 2, and he authorized the acceptance of bid No. 2. After a careful analysis of the figures and a consideration of the whole situation, Judge Hough said:

"This bid No. 2 affords as much security as any person can have at any judicial sale, for it is admittedly made on behalf of a committee of creditors and shareholders who intend to form a ne wcompany, and who control by

assignment more than 90 per cent. of all the admitted liabilities of all the companies; so that in effect, under the plan of reorganization as a part of which this bid is made, nonassenting and contesting creditors have the security of all the property offered for sale to cover a very small proportion of the alleged liability. In my judgment bid No. 2 is the best bid made."

The decree accepting the bid and confirming the sale thereunder, filed January 11, 1913, was intended inter alia—and properly so—to liquidate the claims of nonassenting creditors of Maxwell-Briscoe Motor Company at 60 cents on the dollar. In due course the property was transferred to the new company. The bid which was thus accepted read that the purchasers—

"Will pay or cause to be paid to the holders of claims *heretofore filed* in the above-entitled suits, * * * the following percentages of the amount of said claims as finally determined and allowed, * * * and after the same shall be finally adjudged * * * entitled to share in the distribution of the proceeds of sale. * * *"

On January 11, 1913, however, plaintiffs had not filed any claim, and could not file any claim, for the reason that rent due under plaintiffs' lease had been paid quarterly in advance on September 10, 1912, and December 10, 1912. On March 10, 1913, the rent was again paid in advance, thus putting plaintiffs in a position where the next rent payment would not be due until June 10, 1913.

On March 11, 1913, Maxwell Motor Company (the new company), pursuant to the power (quoted supra) given in the final decree of sale, filed in this court notice of intention not to assume Maxwell-Briscoe Motor Company's guaranty of the plaintiffs' lease. In other words, although the rent was paid on March 10, 1913, the new company on March 11, 1913, the last of the 60 days allowed to it to disaffirm, did then disaffirm or decline to assume the obligation of the guaranty. Plaintiffs, of course, were helpless until June 10, 1913, the next rent day, and on that day the lessee defaulted in the payment of rent.

On June 15, 1913, plaintiffs attempted to distrain for rent on the property of United Motor Chicago Company, the lessee; but on June 24, 1913, the lessee filed a voluntary petition in bankruptcy, and was adjudicated a bankrupt on June 27, 1913, and in due course was discharged; only a small percentage of the claims against it having been made. After considerable litigation, plaintiffs on November 1, 1917, obtained a judgment against Maxwell-Briscoe Motor Company for $142,560, execution was thereafter issued and returned "No property found" on December 27, 1917, and this suit was begun on July 12, 1918.

From the foregoing it will be seen that this was a stockholders' reorganization, but that the case differs in two respects from Northern Pacific Co. v. Boyd, 228 U. S. 482, 33 Sup. Ct. 554, 57 L. Ed. 931, first, in that there were no secured creditors, and, secondly, in that the claim had not accrued at the time of the decree of sale. The question to be decided is whether these differences, on the facts in this case, take it out of the principles laid down in the Boyd Case and followed in Kansas City Southern Railway Co. v. Guardian Trust Co., 240 U. S. 166, 36 Sup. Ct. 334, 60 L. Ed. 579.

In the Boyd Case no provision whatever was made for creditors.

The procedure was the then familiar one, by which the creditor was barred out by mortgage foreclosure decree and the property came back to the stockholders, usually scaled down and after levying an assessment to enable it to continue as a going concern. In the Kansas City Southern Railway Case the court found that the provision made for creditors was wholly inadequate.

In the case at bar, as there were no secured creditors, the reorganization was as much a creditors' as a stockholders' reorganization, and the provisions for the creditors, both in the reorganization plan and in the decree of sale, were entirely fair as far as they went; but the difficulty is that no provision whatever was made for such a claim as that of plaintiffs, although the decree put it in the power of the purchaser, the new company, to destroy the security of the lease. In order that there may be no misunderstanding, it is well to restate that a so-called stockholders' reorganization may be and often is an entirely feasible and desirable method of reconstructing a corporate enterprise, and of thereby saving for creditors and stockholders as a going concern a business which otherwise might be destroyed or disintegrated if knocked down at auction. As said by Judge Sanborn in St. Louis-San Francisco Railway Co. v. McElvain (D. C.) 253 Fed. 123, 133:

"There is no moral turpitude, nor is there any illegality, in the making and performance of an agreement between the bondholders. secured by mortgages, the stockholders, and the unsecured creditors of an insolvent mortgagor, that there shall be a foreclosure and sale of the mortgaged property to or for the benefit of a new corporation, in which all the members of the three classes shall be permitted, at the option of each of them, to take the bonds or stock of the new corporation in substantial proportion to the respective ranks anu equities of the classes. Indeed, a foreclosure and sale under such an agreement is the most practicable, equitable, and beneficial method of foreclosure and sale of vast railroad or other properties that has yet been devised."

But, where no provision is made for an unsecured creditor, then the doctrine of the Boyd Case is inescapable; for, said the court at page 504 of 228 U. S., at page 560 of 33 Sup. Ct. (57 L. Ed. 931):

"If purposely or unintentionally a single creditor was not paid. or provided for in the reorganization, he could assert his superior rights against the subordinate interests of the old stockholders in the property transferred to the new company. They were in the position of insolvent debtors, who could not reserve an interest as against creditors. Their original contribution to the capital stock was subject to the payment of debts. The property was a trust fund charged primarily with the payment of corporate liabilities. Any device, whether by private contract or judicial sale under consent decree, whereby stockholders were preferred before the creditor, was invalid. Being bound for the debts. the purchase of their property, by their new company, for their benefit, put the stockholders in the position of a mortgagor buying at his own sale."

Quoting again from Judge Sanborn in the St. Louis-San Francisco Railway Co. Case, supra:

"The foreclosure decrees and sales which have been held fraudulent in law and voidable as against unsecured creditors in the Boyd Case. and the other cases cited above, were those that had been made under agreements between the secured bondholders and the stockholders of the mortgagor, whereby the stockholders received beneficial interests, by means of stock, bonds,

or otherwise, in the purchasing corporation, without giving or offering any such beneficial interest whatever to the unsecured creditors, in violation of the trust under which an insolvent corporation holds its property. for, first, its secured creditors; second, its unsecured creditors; and, third, and last, its stockholders."

From all that has thus far been said, it is plain that the difficulty in the case at bar is that no provision was made for plaintiffs' claim, and it is not unlikely that the necessity for such provision did not occur to the purchaser, in view of the fact that the Boyd Case was not decided until April 28, 1913, some weeks after the disaffirmance date of March 11, 1913, and its principles were not as well known and as firmly established as they are now.

Plaintiffs, therefore, retained the right to subject the interest of the old stockholders in the property to the payment of their claim. If their interest is valueless, he gets nothing. If it be valuable, he merely subjects that which the law had originally and continuously made liable for the payment of corporate liabilities. On the facts the special master has found that the property of Maxwell-Briscoe Motor Company, of which defendant Maxwell Motor Company, Incorporated, became the owner, was amply sufficient to pay the claim here sought to be enforced, and with that conclusion I agree.

[2] The remaining question is that which arises from the contingent nature of the claim. On this branch of the case it is desirable to limit the court's decision to the particular facts here developed. It may well be that situations may develop where claims of a contingent character may have no standing in a court of equity. The status of contingent claims similar to that at bar is explained in People v. Metropolitan Surety Co., 205 N. Y. 135, 98 N. E. 412, Ann. Cas. 1913D, 1180, and the rules as to what claims are provable are set forth in Pennsylvania Steel Co. v. New York City Railroad Co., 198 Fed. 721, 117 C. C. A. 503. If, therefore, this estate had been wound up prior to March 11, 1913, without a stockholders' reorganization, this claim would not have been provable, and would have been barred.

In such cases there is a fund for distribution, and the necessity for ascertaining claims "at a time consistent with the expeditious settlement" of estates is the reason for holding as nonprovable those claims "which are so uncertain that their worth cannot be ascertained," even if such claims be "highly meritorious." But where, as here, there is a stockholders' reorganization, and the new company by its own act sets in motion the default which matures a contingent into an absolute liability, a court of equity cannot permit it to benefit by that act.

If defendant Maxwell Motor Company, Incoporated, had let March 11, 1913, go by without filing its intention not to assume the lease, it would have been liable to plaintiffs. When it became the owner of the property of Maxwell-Briscoe Motor Company, it knew or ought to have known the latter's contingent liability in respect of this lease, and it would be strange if a court of equity would permit a creditor to be so positioned as to prevent him from proving his claim or participating in a reorganization, while at the same time leaving him remediless by virtue of the act of a corporation created as a part of the plan of

reorganization; for it must not be forgotten that the March rent was paid after the decree of sale and after the delivery of the property thereunder to Maxwell Motor Company, Incorporated.

It is suggested that, if the conclusions of the special master be sustained, difficulties will arise in working out the plans of beneficial reorganizations; but I think this is a needless fear. Equity usually succeeds in molding its decrees to the requirements of the situation with which it deals, and finds a way to practical as well as just results. Other points raised are fully covered by the special master's report and do not require elaboration.

Exceptions are overruled, and the special master's report is sustained. Submit decree on notice.